## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **In re Langdon & Company, LLP Data Breach Litigation** | Case No. 5:25-cv-00544-FL<br><br> **CONSOLIDATED COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiffs Aaron Ginsburg, Brenda Grimes, Kermit Nobles, and Jimmy Sadler ("Plaintiffs") bring this Consolidated Class Action Complaint on behalf of themselves, and all others similarly situated, against Defendant Langdon & Company, LLP. ("Langdon" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which are based on personal knowledge:

## <u>NATURE OF THE CASE</u>

1.     Plaintiffs bring this class action lawsuit on behalf of all persons whose sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (together with PII, "Private Information") was entrusted to Langdon and was

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79.

impacted in a data breach that Defendant disclosed to Plaintiffs and Class Members on or around August 1, 2025.

2.    Defendant is a financial and accounting services firm based in North Carolina.

3.    Defendant is a service provider to clients including Easterseals UCP North Carolina & Virginia, Inc. ("Easterseals").[2]

4.    In the course of rendering services to its clients, Defendant solicited, obtained, and stored Private Information belonging to Easterseals patients and other individuals.

5.    Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations to keep Plaintiffs' and Class Members' Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

6.    Defendant disclosed that it discovered suspicious activity on its computer network on April 28, 2024, and subsequently began an investigation that revealed that an unauthorized third party had accessed certain files between April 21, 2024, and April 28, 2024 (the "Data Breach" or "Breach").

7.    After its investigation, Defendant determined that, at a minimum, files it received from Easterseals concerning patients of Easterseals were impacted by the Breach.

8.    Indeed, the data exposed in the Breach contained Plaintiffs' and Class Members' PII and PHI.

_____

[2] Easterseals is a nonprofit organization that provides health and human services, incorporated under the provisions of Section 501(c)(3) of the Internal Revenue Code.

9. On or about August 1, 2025, Defendant posted a "Notice of Data Security Event" on its website.[3] ("Aug. 1 Notice") and began individually notifying Plaintiffs' and Class Members. According to public reports, the Breach impacted at least 46,061 patients of Easterseals.[4]

10. As explained herein, the following types of Private Information were compromised in the Data Breach: individuals' full names, addresses, dates of birth, Social Security numbers ("SSN"), Taxpayer Identification Numbers, financial account numbers, medical information, and health insurance information and/or digital signatures.

11. Plaintiffs' claims arise from Defendant's failure to properly secure and safeguard the Private Information that it was entrusted with.

12. Defendant owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendant solicited, collected, used, and derived a benefit from this Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

13. The sensitive nature of the data exposed through the Data Breach signifies that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their Private Information and are subject to an increased risk of identity theft.

---

[3] *Notice of Data Security Incident*, Langdon & Company, https://www.langdoncpa.com/databreach-notification/ (last visited December 20, 2025).
[4] Caitlin Anthoney, *Langdon & Co data security incident affects over 46K*, HIPAA Times (Aug. 20, 2025), https://hipaatimes.com/langdon-co-data-security-incident-affects-over-46k.

3

14. Notably, Defendant has not disclosed the nature of the attack, nor why the Breach went unannounced for months, or why it took over a year to determine which files were impacted.

15. Despite concluding its investigation on June 3, 2025, Langdon waited two more months to publicly post notice of the Breach.

16. The Breach occurred in part because of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted during the course of its engagement with Easterseals.

17. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiffs' and Class Members' Private Information is now in the hands of cybercriminals.

18. Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and timely notice of the Data Breach.

19. Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief. These risks may last for the rest of their lives.

4

Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

20.    Plaintiffs and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of their Private Information; and (f) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collected and maintained.

21.    Defendant has tacitly acknowledged the concrete injury to Plaintiffs and Class Members insofar as Defendant has offered "affected individuals . . . complimentary credit monitoring and identity theft protection services" and Defendant has taken "steps . . . to improve data security, and any information that does not need to be retained for business purposes or legal reasons is being destroyed."[5]

22.    In short, the steps taken by Defendant reveal the real, imminent, and substantial risk Plaintiffs and Class Members face in the immediate future and as well as the actual harm they have suffered. Indeed, Defendant would not have encouraged

---

[5]    *See*   https://www.hipaajournal.com/data-breach-langdon-company-michigan-medicine   (last    visited December 26, 2025).

Plaintiffs and Class Members, via the Aug. 1 Notice, to enroll in credit monitoring and to take steps to monitor their accounts but for their recognition that Plaintiffs and Class Members were at immediate risk of harm due to the Breach.

23.     Plaintiffs seek monetary damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard the Private Information in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiffs and Class Members for their lifetimes.

24.     More specifically, Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

**PARTIES**

24.     Plaintiff Aaron Ginsburg is an adult, who at all relevant times, was a resident and citizen of the State of North Carolina.

25.     Plaintiff Brenda Grimes is an adult, who at all relevant times, was a resident and citizen of the State of North Carolina.

26.     Plaintiff Kermit Nobles is an adult, who at all relevant times, was a resident and citizen of the State of North Carolina.

27.     Plaintiff Jimmy Sadler is an adult, who at all relevant times, was a resident and a citizen of the State of North Carolina.

6

28.     Defendant Langdon is a North Carolina Limited Liability Partnership, with its principal place of business located at 223 Highway 70 East Pointe, Suite 100, Garner, North Carolina 27529.

**JURISDICTION AND VENUE**

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

29.     This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

30.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

**FACTUAL BACKGROUND**

31.     Langdon is a Certified Public Accounting Firm serving clients throughout the southeastern United States and globally.

32.     Upon information and belief, clients including Easterseals engaged Langdon's professional services, and, in doing so, entrusted Langdon with the Private Information of its patients.

7

33.     Plaintiffs and Class Members are individuals who directly or indirectly entrusted Langdon with their sensitive Private Information.

34.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

35.     Plaintiffs and Class Members value the confidentiality of their Private Information and, accordingly, have taken reasonable steps to maintain the confidentiality of their Private Information.

36.     Plaintiffs and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

37.     By obtaining, collecting, and storing Plaintiffs' and Class Members' Private Information, Defendant assumed equitable and legal duties to safeguard Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

38.     Despite these duties, Defendant failed to employ reasonable data security measures to protect Plaintiffs' and Class Members' Private Information and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiffs' and Class Members' Private Information.

39.     As a result of the Data Breach, Plaintiffs have already experienced identity theft and fraud.

**THE DATA BREACH WAS A FORESEEABLE RISK OF WHICH DEFENDANT WAS ON NOTICE**

40.     It is well known that Private Information, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

41.     Defendant understood that the Private Information it was entrusted with was highly sensitive and of significant value to those who would use it for wrongful purposes.

42.     Defendant also knew that a breach of its computer systems, and exposure of the Private Information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

43.     These risks are not theoretical; in light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

44.     Hackers easily can sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[6]

---

[6] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016) http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

9

45.    As the FTC recognizes, identity thieves can use Private Information to commit an array of crimes including identity theft, and medical and financial fraud.[7]

46.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2023 alone, there were 6,077 recorded breaches— representing a 34.5% increase compared to 2022.[8] This trend is mirrored in identity theft complaints, which nearly doubled over a four-year span—from 2.9 million reports in 2017 to 5.7 million in 2021.[9] Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[10]

47.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, 2024 had the second-

---

[7] *What To Know About Identity Theft*, FTC Consumer Advice (Sept. 2024), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

[8] Flashpoint, *2024 Global Threat Intelligence Report*, (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[9] *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20.

[10] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statisticsfor-mid-year-2022-that-you-need-to-know/?sh=176bb6887864. [14] *Facts & Statistics: Identity Theft and Cybercrime*, n. 12.

highest number of data compromises in the U.S. in a single year since such instances began being tracked in 2005.[14]

48. The ramifications of Defendant's failure to keep Plaintiffs' and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

49. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[11]

50. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and

---

[11] U.S. Gov't Accountability Office, *Report to Congressional Requesters, Personal Information, June 2007*, https://www.gao.gov/new.items/d07737.pdf.

affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

51. The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

52. Moreover, unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

53. The Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a complete remedy for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[12]

54. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of Private Information to steal and then sell.

55. As set forth herein, despite this threat, and other known threats, upon information and belief, Defendant failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

56. Given the value of the Private Information in its possession, Defendant knew or should have known the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. Defendant failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**DEFENDANT BREACHED ITS DUTY TO PROTECT PLAINTIFFS' AND CLASS MEMBERS' PRIVATE INFORMATION**

---

[12] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

57.     Defendant first became aware of the Breach on April 28, 2024, and subsequently launched an investigation[13] The investigation determined that files being stored on Defendant's network were accessed by an unauthorized third party between April 21, 2024, and April 28, 2024.

58.     By June 3, 2025, Defendant had completed its investigation determined which files were impacted and notified Easterseals of its findings.

59.     According to recent news reports, during the Data Breach, the unauthorized third party obtained the Private Information of over 46,000 patients of Easterseals.[14]

60.     The Private Information impacted by the Data Breach includes a wide swath of highly sensitive information belonging to Plaintiffs and Class Members, including their full names, dates of birth, Social Security numbers, financial and banking information, and medical information.[15]

61.     Defendant did not publicly disclose the Breach until August 1, 2025, well over a year after becoming aware of the Breach, and almost two months after the date it claims to have identified the impacted data.

62.     Upon information and belief, Plaintiffs and Class Members only received notice informing them that their Private Information was compromised during the Data Breach on or after August 1, 2025.

---

[13] *Notice of Data Security Incident*, n. 3.

[14] *See* https://hipaatimes.com/langdon-co-data-security-incident-affects-over-46k.

[15] *Id.*

63.     The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures to protect the Private Information that it had collected and stored.

**DEFENDANT FAILED TO COMPLY WITH FTC GUIDELINES**

64.     Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

65.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[16]

66.     Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems:[21]

    a.     Identify all connections to the computers where sensitive information is stored;

    b.     Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

    c.     Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

---

[16] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf. [21] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf (last visited August 27, 2025).

15

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls— settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

67. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for

suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[17]

68.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69.     Defendant failed to properly implement basic data security practices to protect Plaintiffs' and Class Members' Private Information. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

70.     Defendant was at all times fully aware of its obligations to protect the Private Information of its client's patients given the reams of Private Information that was provided to it by Easterseals. Defendant was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

71.     Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[18] Defendant failed to

---

[17] *Id.*
[18] *Protecting Personal Information: A Guide for Business, Fed. Trade Comm'n* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guidebusiness.

disclose that its systems and security practices were inadequate to reasonably safeguard Plaintiffs' and Class Members' Private Information.

72.     The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[19] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

73.     Here, Defendant inexcusably waited over a year after the Data Breach occurred to notify impacted individuals.

**THE DATA BREACH'S INCLUSION OF PHI IS PARTICULARLY SIGNIFICANT**

74.     With respect to data breaches involving PHI, a study by Johns Hopkins University and Michigan State University that was published in 2019 in the Annals of Internal Medicine found the majority (over 70%) of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft.[20]

75.     Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures.

---

[19] *Id.*

[20] *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, DistilINFO (Oct. 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/

76.     The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[21]

77.     Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[22]

78.     As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[23]

79.     The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online . . . ."[30]

80.     Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity. The shelf life for

---

[21] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[22] *Id.*

[23] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX, https://www.idx.us/knowledge-center/you-got-it-they-want-it-criminals-aretargeting-your-private-healthcare-data.[30] Steger, n. 27.

this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[24]

81.     As noted above, some of the information that was compromised in the Data Breach included, among other things, medical information and health insurance information. Accordingly, Plaintiffs and Class Members must remain especially vigilant given the highly sensitive nature of the PHI at issue in this Data Breach.

**DEFENDANT FAILED TO COMPLY WITH HIPAA'S MANDATES**

82.     Defendant is a business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

83.     In addition, Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

---

[24] Justin Klawans, *What is medical identity theft and how can you avoid it?*, The Week (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid.

84. HIPAA's Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information, while HIPAA's Security Standards for the Protection of Electronic Protected Health Information establishes national security standards for health information that is stored or transmitted electronically.

85. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. Such health information includes "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

86. HIPAA's Security Rule requires entities such as Langdon to, *inter alia*, do the following: (i) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (ii) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (iii) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (iv) ensure compliance by its workforce.

87. HIPAA also requires entities such as Langdon to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Langdon is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health

21

information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

88.     Moreover, both HIPAA and HITECH required Langdon to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

89.     Finally, HIPAA requires an entity to provide notice of a data breach to affected individuals "without unreasonable delay and in no case later than 60 days following discovery of the breach." 45 C.F.R. §§ 164.400-414.

90.     Defendant was, at all times, aware of the mandates of HIPAA. Despite being aware of these mandates and its concomitant obligations, Defendant failed to comply with its obligations and protect the PHI of Plaintiffs and Class Members.

91.     Defendant's failure in this regard is especially egregious given that Defendant was fully aware of the breadth and depth of PHI it obtained and stored and the foreseeable consequences that would result from unauthorized disclosure of this information.

**PLAINTIFFS AND CLASS MEMBERS SUFFERED DAMAGES**

92.     Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the

22

value of Plaintiffs' and Class Members' Private Information has been diminished by its exposure in the Data Breach.

93.     Plaintiffs and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information as a result of the Data Breach. From a recent study, 28% of individuals affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[25]

94.     Further, Plaintiffs and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

95.     Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[26]

96.     Plaintiffs and Class Members are also at a continued risk because their information remains unprotected in Langdon's systems, susceptible to further compromise

---

[25] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.
[26] Kathryn Parkman, *How to Report identity Theft*, Consumer Affairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

so long as Langdon fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

97.     Plaintiffs and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

98.     As a result of Defendant's failures detailed herein, Plaintiffs and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable Private Information; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their Private Information being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their Private Information; and continued risk to Plaintiffs' and the Class Members' Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Langdon fails to undertake appropriate and adequate measures to protect the Private Information entrusted to it.

**PLAINTIFFS' EXPERIENCES AND INJURIES**

### *Plaintiff Aaron Ginsburg*

99.     Plaintiff Aaron Ginsburg was a patient of Easterseals and is a data breach victim.

100.    To obtain medical services from Easterseals, Plaintiff Ginsburg was required to provide his Private Information to Easterseals, including name, Social Security number,

date of birth, address, phone number, medical information, and health insurance information, which Defendant obtained in the course of rendering services to Easterseals.

101.    Plaintiff Ginsburg trusted that the Defendant would use reasonable measures to protect his Private Information according to state and federal law.

102.    On or around August 20, 2025, Defendant sent Plaintiff Ginsburg a notice letter informing him that his Private Information, including his Social Security number, was compromised because of the Data Breach.

103.    Defendant deprived Plaintiff Ginsburg of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

104.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Ginsburg's Private Information to cybercriminals who have already used that information for nefarious purposes.

105.    Indeed, since the Data Breach, Plaintiff Ginsburg has suffered from increased spam phone calls on the same phone number that he would have provided to Easterseals to receive services.

106.    In December 2025, Plaintiff Ginsburg was also notified by Capital One that his credit card was shut down due to suspicious (and, in fact, fraudulent) activity on the card.

107.    Also since the Data Breach, Plaintiff Ginsburg has received notifications from his ID protection service, IDShield, that his Private Information is now on the dark

web. Plaintiff Ginsburg had not received such notifications prior to his Private Information being compromised in the Data Breach.

108.    As a result of the Data Breach, Plaintiff Ginsburg suffered actual injury in the form of damage to and diminution in the value of his Private Information.  After all, Private Information is a form of intangible property – property that Defendant was required to adequately protect.

109.    As a result of the Data Breach, Plaintiff Ginsburg has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to having to obtain a new credit card from Capital One due to the aforementioned fraudulent activity. He also monitors his bills and accounts due to the notifications he received that his information is on the dark web. In sum, Plaintiff Ginsburg has spent time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including work and/or recreation.  This time has been lost forever and cannot be recaptured.

110.    As a result of the Data Breach, Plaintiff Ginsburg fears for his personal financial security and uncertainty over what medical information was revealed in the Data Breach. He is experiencing anxiety, distress and fear because of the Data Breach and the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

111.    Plaintiff Ginsburg is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands

of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Ginsburg about the Data Breach in a timely fashion.

112. Plaintiff Ginsburg has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Brenda Grimes

113. Plaintiff Grimes is a patient of Easterseals and a victim of the Data Breach.

114. To obtain medical services from Easterseals, Plaintiff Grimes was required to provide her Private Information to Easterseals, including name, Social Security number, date of birth, address, phone number, medical information, and health insurance information.

115. Defendant obtained Plaintiff Grimes's Private Information in the course of rendering services to Easterseals.

116. Plaintiff Grimes trusted that Defendant would use reasonable measures to protect her Private Information in accordance with state and federal law.

117. On or about August 20, 2025, Plaintiff Grimes received a notice letter informing her that her Private Information, including her health insurance information which generally includes a person's Social Security number[27], had been accessed and acquired during the Data Breach.

---

[27] *Questions and answers about reporting Social Security numbers to your health insurance company*, IRS, available at: https://www.irs.gov/affordable-care-act/questions-and-answers-about-reporting-social-security-numbers-to-your-health-insurance-company

118.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Grimes' Private Information to cybercriminals.

119.    Defendant deprived Plaintiff Grimes of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Breach.

120.    Plaintiff Grimes suffered actual injury in the form of having her Private Information compromised and misused as a result of the Data Breach.

121.    As a direct result of the Data Breach, between September 2025 and November 2025, Plaintiff Grimes experienced several unauthorized charges on her bank cards stemming from fraudulent purchases at various locations. Plaintiff Grimes's bank informed her that someone appeared to be using her Social Security number to gain access to her financial information. Plaintiff Grimes spent significant time and effort resolving these unauthorized charges and has incurred approximately $180.00 in out-of-pocket costs to replace her bank cards.

122.    Additionally, as a direct result of the Data Breach, in November 2025, Plaintiff Grimes received a letter from TransUnion, informing her that Capital One obtained her credit report in what was deemed to be a fraudulent application. However, what was particularly concerning was that the letter from TransUnion was addressed to her home address, but listed another person's name. Thus, as a result of the Data Breach, Plaintiff Grimes has suffered misuse of her Private Information.

123.    Plaintiff Grimes suffered actual injury in the form of damages to and diminution in the value of her Private Information - a form of intangible property that

Plaintiff Grimes entrusted to Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of, the Data Breach.

124. As a result of the Data Breach, Plaintiff Grimes made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching and signing up for the credit monitoring offered by Defendant. Plaintiff Grimes has spent many hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

125. As a result of the Data Breach, Plaintiff Grimes has suffered anxiety. These feelings include anxiety about unauthorized parties continuing to view, sell, and/or use her Private Information for purposes of committing cyber and other crimes against her. Plaintiff Grimes is very concerned about this increased, substantial, and continuing risk, as well as the long-term consequences that identity theft and fraud resulting from the Data Breach will have on her life.

126. As a result of the Data Breach, Plaintiff Grimes anticipates she will need to continue spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

127. Plaintiff Grimes has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Kermit Nobles*

128. Plaintiff Kermit Nobles is a victim of the Data Breach.

29

129. Plaintiff Nobles is not a patient of Easterseals, but donated to Easterseals in the past.

130. To make this donation, Plaintiff Nobles was required to provide his Private Information to Easterseals, including his name, date of birth, address, email address, and payment card information. Plaintiff is unsure how or why Easterseals or Defendant would have had his medical information or health insurance information.

131. Defendant obtained Plaintiff Nobles's Private Information in the course of rendering services to Easterseals.

132. Plaintiff Nobles trusted that Defendant would use reasonable measures to protect his Private Information in accordance with state and federal law.

133. On or about August 20, 2025, Plaintiff Nobles received a notice letter informing him that his Private Information, including his medical information and health insurance information, had been accessed and acquired during the Data Breach.

134. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Nobles's Private Information to cybercriminals.

135. Defendant deprived Plaintiff Nobles of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

136. Plaintiff Nobles suffered actual injury in the form of having his Private Information compromised and misused as a result of the Data Breach.

137. As a direct result of the Data Breach, approximately six months ago, Plaintiff Nobles noticed an unauthorized charge on his Wells Fargo debit card when reviewing his

bank statement. This is the same Wells Fargo account that Plaintiff used to make the donation to Easterseals. As a result of the fraudulent charge, Plaintiff Nobles spent time and effort working with Wells Fargo to flag the charge as fraudulent.

138. As a direct result of the Data Breach, also within the last six months, Plaintiff Nobles received an alert from his online banking platform that someone tried to obtain a loan at Wells Fargo in his name. Plaintiff Nobles used money from his Wells Fargo account to make the donation to Easterseals. As a result of the alert from Wells Fargo, Plaintiff spent time and effort reviewing and confirming the loan application was fraudulent.

139. As a direct result of the Data Breach, within the last year, Plaintiff Nobles received an email from Experian notifying him that his Private Information was found on the Dark Web. Experian offered Plaintiff Nobles credit monitoring services as a result of this finding, which Plaintiff Nobles accepted.

140. As a result of the Data Breach, Plaintiff Nobles made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching and signing up for credit monitoring. Plaintiff Nobles has spent many hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

141. As a result of the Data Breach and the misuse of his Private Information, Plaintiff Nobles has suffered anxiety. Plaintiff Nobles is very concerned about this increased, substantial, and continuing risk of identity theft, as well as the long-term

31

consequences that identity theft and fraud resulting from the Data Breach will have on his life.

142.    As a result of the Data Breach, Plaintiff Nobles anticipates he will need to continue spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

143.    Plaintiff Nobles has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Jimmy Sadler*

144.    Plaintiff Jimmy Sadler is a patient of Easterseals and a victim of the Data Breach.

145.    To obtain medical services from Easterseals, Plaintiff Grimes was required to provide his Private Information to Easterseals, including his name, Social Security number, date of birth, address, phone number, medical information, and health insurance information.

146.    Defendant obtained Plaintiff Sadler's Private Information in the course of rendering services to Easterseals.

147.    Plaintiff Sadler trusted that Defendant would use reasonable measures to protect her Private Information in accordance with state and federal law.

148.    On or about August 20, 2025, Plaintiff Sadler received a notice letter informing him that his Private Information, including his health insurance information

32

which generally includes a person's Social Security number[28], had been accessed and acquired during the Data Breach.

149.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Sadler's Private Information to cybercriminals.

150.     Defendant deprived Plaintiff Sadler of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

151.     Plaintiff Sadler suffered actual injury in the form of having his Private Information compromised and misused as a result of the Data Breach.

152.     As a direct result of the Data Breach, in December of 2025, an unauthorized third party attempted to access Plaintiff's Capital One credit card account. Plaintiff previously used his Capital One credit card to pay for services at Easterseals.

153.     As a direct result of the Data Breach, since the Data Breach, Plaintiff Sadler has received messages from Bank of America that he has been pre-approved for credit, despite never having applied for such credit.

154.     Plaintiff Sadler suffered actual injury in the form of damages to and diminution in the value of his Private Information - a form of intangible property that Plaintiff Sadler entrusted to Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of, the Data Breach.

---

[28] *Questions and answers about reporting Social Security numbers to your health insurance company*, IRS, available at: https://www.irs.gov/affordable-care-act/questions-and-answers-about-reporting-social-security-numbers-to-your-health-insurance-company

155. As a result of the Data Breach, Plaintiff Sadler made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breac and reviewing financial accounts for any indications of actual or attempted identity theft or fraud. Plaintiff Sadler has spent many hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

156. As a result of the Data Breach, Plaintiff Sadler has suffered anxiety. These feelings include anxiety about unauthorized parties continuing to view, sell, and/or use her Private Information for purposes of committing cyber and other crimes against him. Plaintiff Sadler is very concerned about this increased, substantial, and continuing risk, as well as the long-term consequences that identity theft and fraud resulting from the Data Breach will have on his life.

157. As a result of the Data Breach, Plaintiff Sadler anticipates he will need to continue spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

158. Plaintiff Sadler has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future.

## CLASS ALLEGATIONS

159. Plaintiffs bring this class action on behalf of themselves and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

160. Plaintiffs seek to represent a class of persons to be defined as follows:

All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").

161. Excluded from the Class are Langdon, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families. Also excluded from the Class are Easterseals, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, and the members of their immediate families.

162. This proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

163. **Numerosity:** Plaintiffs are informed and believe, and thereon allege, that there are at minimum, tens of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach. Based solely on public information, the Class includes over forty-six thousand individuals.

164. **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a.     Whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Private Information;

b.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.     Whether Defendant was negligent in maintaining, protecting, and securing Private Information;

d.     Whether Defendant breached its promises to safeguard Plaintiffs and the Class's Private Information;

e.     Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.     Whether Defendant's Aug. 1 Notice was reasonable;

g.     Whether the Data Breach caused Plaintiffs' and the Class's injuries;

h.     What the proper damages measure is;

i.     Whether Plaintiffs and the Class are entitled to damages, treble damages, or injunctive relief.

165.     **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. The claims of the Plaintiffs and Class Members are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and members of the Class all had their Private Information kept by Defendant, and each had their Private Information exposed and/or accessed by an unauthorized third party.

36

166.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical, as explained above.

167.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision making.

168.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiffs and each member of the Class. If Defendant breached its duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

169. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

170. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Class)**

171. Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

172. Plaintiffs and Class Members provided their non-public Private Information to Defendant through Defendant's clients, s, and that information was entrusted to Defendant in the course of this professional engagement.

173. Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the Private Information it collected as a condition of providing its professional services from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII and PHI in Defendant's possession was adequately secured and protected.

174. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

175. Defendant owed a duty of care to Plaintiffs and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

176. Defendant had a special relationship with Easterseals and its other clients, and thus Plaintiffs and Class Members. Their willingness to entrust Defendant with Plaintiffs' and Class Members' Private Information as a condition of receiving professional services was predicated on the understanding that Defendant would take adequate security precautions to protect that Private Information.

177. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

178. Plaintiffs' and Class Members' Private Information was entrusted to Defendant with the understanding that Defendant would safeguard this information.

179. Defendant's conduct also created a foreseeable risk of harm to Plaintiffs and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

180. Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

181. Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its client's patients, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached its common law, statutory, and other duties to Plaintiffs and Class Members in numerous ways, including by:

   a. failing to adopt reasonable data security measures, practices, and protocols;

   b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiffs' and Class Members' PII and PHI;

   c. storing PII and PHI longer than reasonably necessary;

   d. failing to comply with industry-standard data security measures; and

   e. failing to timely disclose critical information regarding the nature of the Data Breach.

182. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiffs' and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiffs and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

183.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

184.    Defendant breached these duties as evidenced by the Data Breach.

185.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs and Class Members' Private Information by:

    a.    providing access to this information to third parties, and;

    b.    failing to properly supervise both the way that Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

186.    Moreover, Defendant breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries in fact.

187.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

188.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

189.     Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

190.     As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration,, and emotional distress.

191.     Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

### COUNT II
### Negligence *per se*
### (On Behalf of Plaintiffs and the Class)

192.     Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

193.     Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

194.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the Class Members' sensitive Private Information.

195.   Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq.*, Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

196.   Defendant breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

197.   Defendant violated Section 5 of the FTC Act, HIPAA, and similar state statutes by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with industry standards.

198.   The harm that has occurred is the type of harm the FTC Act and HIPAA is intended to guard against.

199.   Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

200.   But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

43

201.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties.  Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and member of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

202.    Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

203.    As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## COUNT III
## <u>Breach of Third Party Beneficiary Contract</u>
## (On Behalf of Plaintiffs and the Class)

204.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

205.    Defendant entered into one or more contracts with its clients, written or implied, to provide accounting services.

206.    Pursuant to that contract, Defendant received, among other things, Plaintiffs' and Class Members' Private Information from Easterseals and their other clients in exchange for Defendant's services.

207.     Upon information and belief, the contracts between these entities and Defendant contained material terms requiring Defendant to use reasonable data security sufficient to safeguard Plaintiffs' and Class Members' Private Information.

208.     Defendant knew that Plaintiffs and the Class Members were the intended beneficiaries of the contracts between their clients, including Easterseals, and Defendant.

209.     Defendant also knew that if it breached its contractual obligation to safeguard the Private Information with which it had been entrusted, Plaintiffs and Class Members would be harmed.

210.     Defendant breached these contracts – as evidenced by the Data Breach – by failing to use reasonable data security measures sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

211.     As a direct and proximate result of Defendant's breaches of these contracts, Plaintiffs and Class Members have all suffered and will continue to suffer injuries as set forth herein, and are entitled to damages sufficient to compensate for the losses they sustained as a direct result thereof.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

212.     Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

213.     Plaintiffs and Class Members conferred a benefit on Defendant by permitting Defendant's clients to entrust Defendant with their Private Information.

45

214.    The monies Defendant was paid by its clients in the ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

215.    Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

216.    Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein before their clients provided Defendant with Plaintiffs' and Class Members' Private Information.

217.    Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

218.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing ineffective security measures and diverting those funds to its own personal use. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

219. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and as a result, Defendant was overpaid.

220. Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

221. Plaintiffs and Class Members have no adequate remedy at law.

222. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

223. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

47

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      For an Order certifying this action as a class action, appointing Plaintiffs as class representatives for the Class, and appointing Plaintiffs' counsel to represent the Class;

B.      For equitable relief enjoining Langdon from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII and PHI, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.      For equitable relief compelling Langdon to utilize appropriate methods and policies with respect to data collection, storage, and safety, and to disclose with specificity the types of PII and PHI compromised as a result of the Data Breach;

D.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Langdon's wrongful conduct;

E.      Ordering Langdon to pay for not less than ten years of credit monitoring services for Plaintiffs and Class Members;

F.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.      For an award of punitive damages, as allowable by law;

H.      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I.      Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

**Dated: January 2, 2026**

Respectfully submitted,

/s/ *Jean S. Martin*
Jean S. Martin
N.C. Bar No. 25703
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 6th Floor
Tampa, FL 33602
T: 813-559-4908
jeanmartin@forthepeople.com

Gerald D. Wells, III
(*pro hac vice forthcoming*)
LYNCH CARPENTER, LLP
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
F: 267-609-6955
jerry@lcllp.com

*Plaintiffs' Interim Co-Lead Counsel*

49